BROWNE GEORGE ROSS LLP
Thomas P. O'Brien (State Bar No. 166369)
  tobrien@bgrfirm.com
Jennie Wang VonCannon (State Bar No. 233392)
  jvoncannon@bgrfirm.com
David J. Carroll (State Bar No. 291665)
  dcarroll@bgrfirm.com
Nathan F. Brown (State Bar No. 317300)
  nbrown@bgrfirm.com
801 S. Figueroa Street, Suite 2000
Los Angeles, California 90017
Telephone: (213) 725-9800
Facsimile: (213) 725-9808

Attorneys for Plaintiff
Francis J. Racioppi, Jr.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCIS J. RACIOPPI, JR.,<br><br>          Plaintiff,<br><br>     vs.<br><br>DMITRY BORISOVICH BOSOV, *et al.*,<br><br>          Defendants. | Case No. 2:20-cv-03797-FMO (JCx)<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANTS' SUPPLEMENTAL OPPOSITION RE: ATTACHMENT; DECLARATIONS OF FRANCIS J. RACIOPPI, JR., RYAN TONGOL, AND DAVID CARROLL; EVIDENTIARY OBJECTIONS**<br><br>Date:    May 21, 2020<br>Time:    2:00 p.m.<br>Ctrm.:   750 (Telephonic)<br><br>Judge:  Hon. Jacqueline Chooljian<br><br>Trial Date:  None Set |

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ........................................................................... 1

II.  ARGUMENT ................................................................................. 2

   A.   GFG Terminated Plaintiff ..................................................... 2

      1.   Only the GFG Board Could Exempt Plaintiff From Its
           Own Termination Orders, and It Undisputedly Never Did .......... 3

      2.   Plaintiff Undisputedly Never Tendered His Resignation ............. 4

      3.   The Evidence Does Not Support Defendants' Narrative
           That Plaintiff Was Always Exempt From the Termination
           Orders ............................................................................ 6

   B.   Plaintiff Can Recover Attorney's Fees ................................. 10

   C.   The Bolsa Road Property is Unsuitable for Attachment ...................... 10

   D.   Attachment is Appropriate Regardless of Whether Defendants
        Are Actively Evading Creditors ........................................... 12

III. CONCLUSION .............................................................................. 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gen. Video Corp. v. Kertesz*,
  2008 WL 5247120 (Del. Ch. Dec. 17, 2008) .......................................................4

*Lomes v. Hartford Fin. Servs. Grp., Inc.*,
  88 Cal. App. 4th 127 (2001) ...............................................................................4

*Online Res. Corp. v. Lawlor*,
  285 Va. 40 (2013) ...............................................................................................4

*Tuolumne Jobs & Small Bus. All. v. Superior Court*,
  59 Cal. 4th 1029 (2014) ..................................................................................3, 5

*Wolfes v. Burlington Ins. Co.*,
  2010 WL 842327 (N.D. Cal. Mar. 10, 2010) ......................................................4

**Statutes**

Cal. Civ. Code § 1281.8(b) ....................................................................................13

Cal. Code Civ. Proc. § 484.090(a)(1)–(4) ............................................................13

Cal. Code Civ. Proc. § 485.010(b) ........................................................................13

Cal. Corp. Code § 300(a) .........................................................................................3

Cal. Corp. Code § 312(b) ................................................................................3, 4, 5

Cal. Lab. Code § 218.5(a) ..................................................................................2, 10

**Other Authorities**

Cal. Prac. Guide—Corps., *Director Meetings and Actions* § 6:173
  (2020) .................................................................................................................3

Corporations, *Removal or Resignation of Officers or Agents* § 8:5 (3d.
  2020) .................................................................................................................4

PLAINTIFF'S RESPONSE TO DEFENDANTS' SUPPLEMENTAL OPPOSITION RE: ATTACHMENT

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.     INTRODUCTION**

Despite the sea of competing facts and narratives that have been offered regarding Plaintiff's separation from the Genius Fund Group ("GFG"), the truly dispositive facts for Plaintiff's request for attachment remain undisputed: GFG's newly-minted Board of Directors unanimously issued a directive "**[l]aying off 100% GF personnel** starting March 27th 2020"; GFG's newly-minted President, Defendant Shinder, issued an executive order implementing that directive, which stated that "[a]ll existing staff, including employees **and management will be laid off** and let go on the date of March 27th 2020 **completely and with no exception**"; and there is no evidence that GFG's Board—which as a matter of law has ultimate authority over the retention of corporate officers—exempted Plaintiff from its all-encompassing termination directive.  On top of this, as Defendants concede, Plaintiff never submitted a written resignation, which is the only statutorily-authorized manner in California in which a corporate officer *can* resign.  To the contrary, Plaintiff unsuccessfully pleaded for clarification on whether GFG would continue to honor his employment contract after receiving the termination directive.  It became clearer by the day that GFG would not.  These facts make clear that Plaintiff was terminated and thus is likely to prevail on his breach of contract claim.

Even if the Court does wade into the remaining details, the documentary evidence simply does not support Defendants' narrative that Plaintiff was always officially exempt from the termination orders and confirmed to be a part of Defendant Shinder's long-term restructuring plan.  Defendant Shinder only ever expressed to Plaintiff (orally and unilaterally) one caveat to the March 23 termination orders: that operations *might* continue in some capacity, and likely under a new corporate structure, *if* he could quickly secure a new investor—but that, unless and until he did, these termination and shutdown orders stood firm.  Defendant Shinder ultimately never secured a new investor, effectively ending the

hypothetical prospect of Plaintiff continuing with GFG because GFG had no money to continue operating.  Of course, there is in any event substantial doubt whether GFG would have honored his contract even with a new investor, as neither Defendant Shinder nor the Board ever confirmed in writing this caveat or Plaintiff's supposed exemption from the termination orders, and Defendant Shinder informed at least one other person that Plaintiff would not be a part of GFG going forward— *before* Plaintiff's counsel ever reached out to GFG.

Defendants' two remaining objections to attachment are also not persuasive. Contrary to Defendants' argument, California Labor Code section 218.5(a) mandates the recovery of attorney's fees by the prevailing party "[i]n any action brought for the nonpayment of wages"—which is precisely what this action is. Moreover, that statute was specifically cited in Plaintiff's initial application.  Appl. at 11, ECF No. 10-1.  Next, there are a litany of reasons why the December 2019 appraisals of the Bolsa Road properties do not reflect their true current value and thus render them unsuitable for attachment here—including that, only three years ago, the larger property apparently sold for less than *half* of the December 2019 appraisal amount.

For these reasons, the Court should issue a right to attach order and writ of attachment against each Defendant in the sum of $3,745,613.68.

## II.   **ARGUMENT**

### A.   **GFG Terminated Plaintiff**

There are three independent bases for concluding that Plaintiff is likely to prevail in showing that GFG terminated Plaintiff: (1) GFG's Board, which has ultimate authority over the retention of corporate officers, never exempted Plaintiff from its all-encompassing termination directive; (2) Plaintiff never tendered his resignation in writing, which is the only statutorily-authorized method for a corporate officer to resign, nor did he do so orally; and (3) Defendants' self-serving narrative that GFG had always intended to keep Plaintiff on as part of a corporate

1  restructuring is simply not supported by the evidence.

2             **1.**      **Only the GFG Board Could Exempt Plaintiff From Its Own**

3                        **Termination Orders, and It Undisputedly Never Did**

4        The lack of any Board directive exempting Plaintiff from the company-wide

5  layoffs is dispositive of the termination issue.  A bedrock tenet of corporate law is

6  that a corporation's board of directors has full and ultimate control over all

7  corporate affairs.  *See, e.g.*, Cal. Corp. Code § 300(a) ("Subject to the provisions of

8  this division and any limitations in the articles . . . the business and affairs of

9  the corporation shall be managed and all corporate powers shall be exercised by or

10 under the direction of the board . . . .").  "Thus, *all* matters involving the 'business

11 and affairs' of the corporation are subject to ultimate direction by

12 its board of directors.  And, whenever corporate action is required, it means action

13 by, or under the authority of, the board (subject to shareholder approval, where

14 required)."  6-C Cal. Prac. Guide—Corps., *Director Meetings and Actions* § 6:173

15 (2020) (emphasis in original).  Although the handling of day-to-day corporate affairs

16 is typically delegated to corporate officers, "specific board action will be required

17 for any action *not* in the ordinary course of business"—including the "[e]lection or

18 removal of officers."  *Id.* (emphasis in original).  That is, corporate officers "shall be

19 chosen by the board and serve at the pleasure of the board, subject to the rights, if

20 any, of an officer under any contract of employment."  Cal. Corp. Code § 312(b);

21 *see also* Defs.' Suppl. Opp. at 3, ECF No. 24 ("Every American CEO reports to a

22 board of directors.").

23       Here, there is no dispute that the GFG Board issued a directive terminating

24 "100% [of] GF personnel" and that Defendant Shinder, implementing the Board's

25 decision, issued an executive order terminating "[a]ll . . . employees and

26 management . . . completely and with no exception."  Racioppi Decl. ¶ 36, Exs. 23,

27 24, ECF No. 10-10.  There is no evidence whatsoever, whether documentary or

28 testimonial, that the GFG Board exempted Plaintiff from those unequivocal

termination orders—and Defendants do not argue otherwise.  That alone is conclusive of the termination issue.  Defendants' claim that Defendant Shinder orally exempted Plaintiff from the Board's termination orders, even if true, is of no moment, because Defendant Shinder lacked the authority to make such an exemption.  *See, e.g.*, *Lomes v. Hartford Fin. Servs. Grp., Inc.*, 88 Cal. App. 4th 127, 134 (2001) ("A corporation does not act through individual directors but, rather, through its board of directors.  An individual director has no authority to take action on behalf of the corporation without the consent of the Board of Directors." (citations omitted)).[1]

## 2.   Plaintiff Undisputedly Never Tendered His Resignation

The California Corporations Code provides only one method for an officer to resign from the company: "Any officer may resign at any time upon written notice to the corporation without prejudice to the rights, if any, of the corporation under any contract to which the officer is a party."  Cal. Corp. Code § 312(b).  Although California courts are yet to interpret this provision, at least one secondary authority has interpreted it as requiring a written resignation.  1 Treatise on the Law of Corporations, *Removal or Resignation of Officers or Agents* § 8:5 (3d. 2020) ("Some states now have a statute requiring that the resignation of an officer or agent be in writing." (citing Cal. Corp. Code § 312(b))).[2]  Indeed, any other construction

---

[1] *See also Wolfes v. Burlington Ins. Co.*, 2010 WL 842327, at *6 (N.D. Cal. Mar. 10, 2010) ("Wolfes cannot have been performing her duties as an officer or director when she was trying to prevent that which the directors and shareholders of Big Sky had decided to do."); *cf. Online Res. Corp. v. Lawlor*, 285 Va. 40, 66–67 (2013) (McLanahan, J., concurring in part and dissenting in part) ("[U]nder general corporate law principles, the power to direct a company lies in the board of directors, not any single individual.  Although Lawlor saw the company as his own, control rested with the board of directors." (citing Del. Code tit. 8, § 142(a))).

[2] Although other states interpreting similar statutory provisions have held that written notice is unnecessary where the officer has provided unequivocal oral notice, *see Gen. Video Corp. v. Kertesz*, 2008 WL 5247120, at *18 (Del. Ch. Dec. 17,

1 would render the phrase "upon written notice to the corporation" in § 312(b) pure

2 surplusage. *Tuolumne Jobs & Small Bus. All. v. Superior Court*, 59 Cal. 4th 1029,

3 1037 (2014) ("[Statutory i]nterpretations that . . . render words surplusage are to

4 be avoided." (citations and internal quotation marks omitted)).

5      Here, although Defendants argue that Plaintiff resigned from GFG, they

6 concede that GFG "received no resignation letter or email" from Plaintiff.  Defs.'

7 Suppl. Opp. at 6.  To the contrary, they acknowledge that Plaintiff was extremely

8 concerned about his employment status and repeatedly sought assurances that GFG

9 would "honor the terms of [his employment] contract."  Ex. 54.  Defendants appear

10 to contend that Plaintiff's counsel's April 2, 2020 demand letter to GFG amounted

11 to a resignation, yet nowhere do they (or could they) identify where in that letter

12 Plaintiff stated that he was resigning; indeed, the demand for payment in that letter

13 was wholly premised on a *termination*, not a resignation.  Moreover, in a subsequent

14 communication with GFG's then-Chief Legal Officer Michelle Lynd, Plaintiff's

15 counsel "reiterate[d] that Mr. Racioppi was <u>terminated</u> from Genius Fund; he did

16 not resign . . . ."  Ex. 56 (emphasis in original).[3]  The April 2, 2020 demand letter

17 thus could not reasonably be construed as a resignation letter.  Plaintiff's lack of

18 resignation (written or otherwise) is yet another basis for concluding that he was

19 terminated.

20

21 _____

22 2008), there is certainly no unequivocal oral resignation here either.

23    [3] Notably, at no time did either Ms. Lynd or Defendant Shinder confirm to
Plaintiff's counsel that Plaintiff had *not* been terminated.  Defendant Shinder never

24 responded at all to counsel's letter, and Ms. Lynd's responses centered on why (and
under what authority) did Plaintiff continue communicating with company officers

25 after his March 27 termination date and the fact that Plaintiff's subordinates had not
been made aware of his termination (among other ancillary issues).  Ex. 56.  For the

26 sake of a complete record, Plaintiff has attached several communications between

27 Plaintiff's counsel and Ms. Lynd that Defendants did not include in their opposition.

28 Suppl. Carroll Decl. ¶¶ 3–11, Exs. 70–76.

### 3. The Evidence Does Not Support Defendants' Narrative That Plaintiff Was Always Exempt From the Termination Orders

Defendant Shinder only ever expressed to Plaintiff one caveat to the March 23 termination orders: if, and only if, GFG secured an immediate and substantial capital investment, operations might continue in some form with Plaintiff's participation—albeit likely under a completely different company structure. But Defendant Shinder also made clear that, unless and until that happened, GFG would need to shut down and terminate all employees because it had no money to keep operating. Second Suppl. Racioppi Decl. ¶¶ 8–9. This information was told to Plaintiff at his March 26 in-person meeting with Defendant Shinder. *Id.* On March 27, Defendant Shinder confirmed to Plaintiff by telephone that no such investment had materialized, yet he nonetheless instructed Plaintiff not to begin laying off GF employees at that time—despite the termination orders mandating such. *Id.* ¶ 10.

For the next several days, despite the Board's directives, Defendant Shinder was still attempting to secure an investor; yet he was also directing the shutdown of all GFG operations with *ad hoc* assistance from various (former) company officers—including, at times, Plaintiff, who still held out hope that a new investor would materialize and thus secure his own future employment. *See* Second Suppl. Racioppi Decl. ¶¶ 11–13. On March 29, Defendant Shinder verbally directed the company to shut down and for all employees to be terminated after consultation with outside legal counsel; yet, by March 31, no further guidance had been provided to Plaintiff regarding either the shutdown or the terminations. Exs. 53, 54.

Anxious for official clarification on the status of the company, Plaintiff e-mailed both the Board and Defendant Shinder requesting information on the future of the company, and Plaintiff specifically asked Defendant Shinder whether or not GFG intended to honor his employment contract. Exs. 53, 54. In perhaps the most telling piece of evidence of all, neither the Board nor Defendant Shinder ever responded to these inquiries (or otherwise provided the clarification Plaintiff

sought).  Second Suppl. Racioppi Decl. ¶¶ 12–13.  On April 1, at approximately 11:41 p.m., Plaintiff spoke to Defendant Shinder by telephone, who confirmed that he had not secured an investor.  *Id.* ¶ 14, Ex. 67.  Plaintiff also learned the next morning that Defendant Shinder had informed others that Plaintiff was being fired.  Tongol Decl. ¶¶ 3–4.  At that point, it became crystal clear to Plaintiff that he was not and had never been exempt from the March 23 Board directive laying off "100% [of] GF personnel"; that Defendant Shinder was improperly attempting to either run or resurrect GFG operations without Board authorization; that, in any event, Plaintiff was not and never would be part of any restructuring or reformation of the company; and that, in reality, the March 23 orders laying off "100% [of] GF personnel," including all "staff and management," had terminated his employment.

The contrary narrative that Defendants proffer is riddled with inconsistencies and contradicted by the documentary evidence presented.  For example, Defendant Shinder attached a restructuring plan that Plaintiff sent to him at his request on or around March 22, 2020, suggesting that this was the restructuring blueprint that Defendant Shinder was implementing going forward (and thus suggesting that Plaintiff was obviously part of the restructuring committee the whole time).  However, this restructuring plan was *not* the plan that Defendant Shinder appeared to be implementing later that week—most obviously, Plaintiff's restructuring plan did not call for a complete layoff of all personnel, as reflected in the March 23 directives and executive orders.  Second Suppl. Racioppi Decl. ¶ 3.

In another example, despite Defendant Shinder's repeated assertion that he was "certain" that Plaintiff received the March 23 termination orders by March 24, Second Shinder Decl. ¶¶ 12–13, there is no documentary evidence of this whatsoever—and substantial documentary evidence that Plaintiff received them for the first time only on March 26.  Second Suppl. Racioppi Decl. ¶ 5, Exs. 62, 63.  Defendant Shinder does not attach the purported e-mail or text message showing that he circulated these orders to Ms. Lynd no later than March 24; he does not

attach the text message showing that Ms. Lynd supposedly circulated them to the restructuring committee group chat (of which he and Plaintiff were allegedly a part); and he does not attach the text message showing that *he* supposedly also circulated them to the restructuring committee.  On the other hand, Plaintiff attaches the text messages from Defendant Shinder on March 26 where he sends those orders to Plaintiff—which would make no sense if Defendant Shinder knew that Plaintiff had already received them.  *Id.* ¶ 5, Ex. 62.  In addition, in Plaintiff's March 31 e-mail to the GFG Board, Plaintiff confirmed that these directives were "released to the Genius Fund executive staff on 3/26/20."  Ex. 54.  Plaintiff also attaches the text message where he circulated the termination orders to the company's CFO and CLO as soon as he received them on March 26—with a comment making clear that Plaintiff had only just seen them for the first time.  Second Suppl. Racioppi Decl. ¶ 5, Ex. 63.

Similarly, Defendant Shinder appears to claim that he had a telephonic conversation with Plaintiff on March 26 at 11:40 p.m., where Plaintiff supposedly told Defendant Shinder that he was in New York and asked for assurances regarding his employment with the company.  Second Shinder Decl. ¶ 14.  This conversation never happened, as proven by the details of and circumstances surrounding that call. As an initial matter, Plaintiff was already in Los Angeles on March 26 at 11:40 p.m., as evidenced by his flight itinerary and the fact that he had already met with Mr. Shinder at mid-day on March 26 in person at GFG headquarters, and thus would not have told Defendant Shinder that he was in New York.  Second Suppl. Racioppi Decl. ¶ 6 & n.1, Ex. 64.  But even if Defendant Shinder mistakenly identified the date as March 26 rather than March 25 (when Plaintiff was still in New York), that would not change anything; no such conversation happened on that date either. Indeed, although Plaintiff had generally intended to fly to Los Angeles at some point to meet with Defendant Shinder, the reason why Plaintiff flew across the country from New York to Los Angeles on March 26 specifically was to confront Defendant

1  Shinder because he had ignored Plaintiff's repeated inquiries about the status of the

2  company that week.  *Id.* ¶¶ 6 n.1, 7–8.  Had Defendant Shinder communicated with

3  Plaintiff during that week, Plaintiff would not have made this extremely

4  inconvenient and potentially dangerous trip on March 26.  *Id.*

5       Next, not only is Defendant Shinder's characterization of his March 26 in-

6  person meeting[4] with Plaintiff inaccurate, his claims regarding the events following

7  that in-person meeting are again demonstrably false.  Defendant Shinder claims that

8  the March 26 in-person meeting was the last in-person or telephonic conversation he

9  had with Plaintiff.  Second Shinder Decl. ¶ 16.  Yet Plaintiff and Defendant Shinder

10  planned to, and did, speak to each other approximately 3:00 p.m. the following day

11  regarding the status of the company, as evidenced by the text messages between

12  Plaintiff and Defendant Shinder and Plaintiff's call log.  Second Suppl. Racioppi

13  Decl. ¶ 9, Exs. 65, 66.  It was during that call that Defendant Shinder claimed that

14  the potential investor had not committed any funds, but nonetheless instructed

15  Plaintiff not to begin employee terminations yet (which, per the March 23

16  termination directives, needed to happen that day).  *Id.*  And, contrary to Defendant

17  Shinder's claim, Plaintiff *did* participate in the weekly GFG leadership conference

18  call that day at 4:00 p.m.—as both Plaintiff's call logs demonstrate and as even Ms.

19  Lynd confirmed in her later e-mail exchange with Plaintiff's counsel.  Ex. 56;

20  Second Suppl. Racioppi Decl. ¶ 10, Ex. 66.

21       Perhaps the most critical evidence disproving Defendants' narrative that GFG

22  had candidly exempted Plaintiff from the termination orders all along was the

23  complete lack of response to Plaintiff's March 31 e-mails to the GFG Board and

24  Defendant Shinder regarding the status of the company and Plaintiff's employment.

25  If Plaintiff really was exempt, there is simply no reason why the Board and

26

27  _____

    [4] Defendant Shinder erroneously contends that this meeting occurred on

28  March 27.

1  Defendant Shinder would not have confirmed as much in writing—and probably

2  questioned why Plaintiff ever even had any such concern.  These e-mails also

3  showcase Defendant Shinder's insincerity in now claiming that he "had no reason to

4  think or suspect[] that Plaintiff believed he had been terminated until" he received

5  Plaintiff's counsel's April 2 demand letter.  Second Shinder Decl. ¶ 24.  Plaintiff's

6  e-mails, combined with Defendants' lack of response to both, would have led any

7  reasonable employee to believe they had been terminated—and Defendant Shinder's

8  feigned surprise demonstrates just how contrived his story really is.  And, of course,

9  the fact that neither Ms. Lynd nor Defendant Shinder confirmed to Plaintiff's

10  counsel (following receipt of the April 2 demand letter) that Plaintiff had not been

11  terminated speaks volumes.

## B.    Plaintiff Can Recover Attorney's Fees

13        Defendants mistakenly contend that Plaintiff did not identify a permissible

14  basis to recover attorney's fees in this action.  In fact, Plaintiff's initial application

15  specifically cited California Labor Code section 218.5(a), which mandates the

16  recovery of attorney's fees by the prevailing party "[i]n any action brought for the

17  nonpayment of wages."  Appl. at 11, ECF No. 10-1.  There is no question that the

18  particular claim at issue in this attachment is for the "nonpayment of wages," and

19  Defendants do not argue otherwise.  And because there is a statutory basis for

20  recovering attorneys' fees, it is immaterial that there is no contractual basis for such

21  recovery.  The attachment must therefore include a reasonable sum to cover

22  Plaintiff's attorney's fees.

## C.    The Bolsa Road Property is Unsuitable for Attachment

24        There are myriad reasons to believe that Defendants' current equity in the

25  Bolsa Road property is far less than what Plaintiff will likely recover in a judgment

26  in this action.  Those reasons include:

27        •    It appears that the property sold in 2017 for only $2.35 million—more
             than $3 million less that its appraisal price a mere two years later—
28

making the $5.5 million appraisal price in December 2019 suspect, Suppl. Carroll Decl. ¶ 2, Ex. 68;

- Virtually none of the structures on that property are licensed, Second Suppl. Racioppi Decl. ¶ 16—a fact that the appraiser affirmatively overlooked when conducting the appraisal.  *See* Ex. 57 at 4 ("Appraiser has invoked the ***extraordinary assumption and/or hypothetical condition*** that all of the completed site improvements have been met and completed with all required permits and final inspections having taken place.  Appraisers reserve the right to amend this appraisal if we find that any obtained/supplied information from the client is not true or accurate." (emphasis added)).

- The appraiser noted that he had not reviewed any soils reports, and simply "assumed that soils are adequate for the existing use"—a flabbergasting assumption given that he was appraising agricultural property.  Ex. 57 at 9.

- The appraiser noted that he had never reviewed a title report, and instead relied on his observation that the property "appear[ed]" not to be encumbered by adverse easements or encroachments.  Ex. 57 at 9.

- The person who supervised the appraisal, Michael Andrews, had a clear conflict of interest at the time that this appraisal was assembled.  At the time, Mr. Andrews was both employed by GFG (the purchaser of the property) *and* actively seeking employment with the seller of the property.  Second Suppl. Racioppi Decl. ¶ 17.

- These appraisals were performed almost six months ago in December 2019.  The world has virtually turned upside since then, and it seems beyond doubt that the property would not appraise for the same price now.[5]

- Although the sale of the property was ultimately finalized on April 3, 2020, the price was negotiated and agreed upon in January and February 2020 (prior to the COVID-19 crisis in Los Angeles County), and the original closing date at the end of February 2020.  Second

---

[5] Defendants acknowledge as much when they state, based on the unqualified opinion of Defendant Shinder, that the current market value is actually almost $500,000 less than what it appraised for.  Second Shinder Decl. ¶ 28.

Suppl. Racioppi Decl. ¶ 16.

•      There is a first lien on the property in the amount of $1.75 million.

For these reasons, the Bolsa Road property is simply not adequate to secure the judgment this matter. And while Plaintiff does not contend that he is entitled to a $67 million attachment in order to secure a $3.7 million claim, the fact remains that all Defendants are jointly and severally liable for the harm suffered by Plaintiff and thus he can recover any part or all of the $3.7 million judgment from any of the Defendants. This option will be critical if either Plaintiff ultimately does not prevail against all Defendants or one or more Defendants become insolvent during these proceedings. Without an agreement by Defendants to attach a property with truly sufficient equity to cover the full value of this claim on behalf of all Defendants, the only alternative that will adequately protect Plaintiff's judgment is to attach the full amount of such a judgment against each Defendant.

### D.      Attachment is Appropriate Regardless of Whether Defendants Are Actively Evading Creditors

Defendants' supplemental opposition contests the requested attachment only on three bases: that Plaintiff resigned and was not terminated; that Plaintiff is not entitled to attorney's fees; and that only the Bolsa Road property should be attached, if any. Despite this, Defendants also submit evidence and make an evidentiary objection concerning their attempts to evade creditors. Although it is unclear if Defendants contend that the Court should not issue a writ of attachment on that basis, such an argument would in any event be misguided.

First, now that Defendants have appeared and are opposing attachment, the question of whether Defendants are evading their creditors is largely moot. Although that consideration is relevant where the Court is contemplating issuing an *ex parte* writ of attachment, *see* Cal. Code Civ. Proc. § 485.010(b), where, as now, the defendants have appeared and have contested the attachment, Plaintiff need only show that (1) the claim upon which the attachment is based is one upon which an

attachment may be issued; (2) he has established the probable validity of the claim; (3) the attachment is not sought for a purpose other than the recovery; and (4) the amount to be secured by the attachment is greater than zero.  Cal. Code Civ. Proc. § 484.090(a)(1)–(4).  Plaintiff has amply demonstrated all four prongs, making attachment appropriate.

But even if the question of irreparable injury were still relevant at this point, nothing Defendants submit changes the outcome.  First, Oleg Flaksman's declaration is inherently suspect.  Mr. Flaksman is a GFG representative and thus has a vested interested in the outcome of this case.  Moreover, Mr. Flaksman's contention that a GFG contractor inadvertently sent incorrect WARN Act notices appears contrived.  Once Mr. O'Dowd told Mr. Flaksman that he had received what appeared to be a backdated WARN Act notice, it does not appear that Mr. Flaksman expressed surprise or told Mr. O'Dowd that this must have been an error—which would be the natural reaction to learning such information if it really were an error.  Next, Mr. Flaksman's seemingly-limited concession that GFG appears to have sent out "at least" two incorrect WARN Act notices is actually completely meaningless.  "At least" two could also mean all 187 WARN Act notices to all 187 laid-off employees, but phrasing it as "at least two" gives the impression that the number is substantially lower.

Second, intentionally disposing of assets is in any event only one of several bases for ordering attachment under Section 485.010(b).  Other bases include where the Defendant is obviously insolvent, in the sense of failing to pay debts as they come due.  *See* § 485.010(b)(2).  Again, as previously described at length, GFG was in dire financial straits for months and shuttered its business operations precisely because it no longer had sufficient liquidity to continue operations.  Since then, GFG has left numerous creditors in the lurch.  This is yet another reason why attachment here is necessary.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, the Court should issue a right to attach order and writ of attachment against each defendant.


DATED:  May 20, 2020            Respectfully submitted,

BROWNE GEORGE ROSS LLP
Thomas P. O'Brien
Jennie Wang VonCannon
David J. Carroll
Nathan F. Brown


By:  ___/s/ Thomas P. O'Brien___
Thomas P. O'Brien
Attorneys for Plaintiff Francis J. Racioppi, Jr.