BROWNE GEORGE ROSS LLP
Thomas P. O'Brien (State Bar No. 166369)
  tobrien@bgrfirm.com
Jennie Wang VonCannon (State Bar No. 233392)
  jvoncannon@bgrfirm.com
David J. Carroll (State Bar No. 291665)
  dcarroll@bgrfirm.com
Nathan F. Brown (State Bar No. 317300)
  nbrown@bgrfirm.com
801 S. Figueroa Street, Suite 2000
Los Angeles, California 90017
Telephone: (213) 725-9800
Facsimile: (213) 725-9808

Attorneys for Plaintiff
Francis J. Racioppi, Jr.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCIS J. RACIOPPI, JR., <br><br> Plaintiff, <br><br> vs. <br><br> DMITRY BORISOVICH BOSOV, *et al.*, <br><br> Defendants. | Case No. 2:20-cv-03797-FMO (JCx) <br><br> **SECOND SUPPLEMENTAL DECLARATION OF FRANCIS J. RACIOPPI, JR.** |

# SECOND SUPPLEMENTAL DECLARATION OF
# FRANCIS J. RACIOPPI, JR.

I, Francis J. Racioppi, Jr., declare as follows:

1. I am the plaintiff in this action. I am over the age of eighteen. This declaration is based on my personal knowledge. I submit this second supplemental declaration in support of Plaintiff's response to Defendants' supplemental opposition re: attachment.

2. As outlined in my initial declaration (ECF No. 10-3), I participated in two multi-day oversight meetings with Defendant Bosov regarding the Genius Fund Group's financial status in December 2019 and January 2020. During those meetings, I made clear to Defendant Bosov that GFG was unprofitable and had no viable path to profitability without a complete overhaul of its operations and personnel. I presented Defendant Bosov with a plan to turn the company profitable with a minimal additional cash infusion, which Defendant Bosov appeared to accept as he requested that I implement. In approximately February 2020, I began to implement the company overhaul that Defendant Bosov had approved. I executed this overhaul plan along with other company executives through early March 2020. The February 19, 2020 email attached as **Exhibit 51** to the second declaration of Defendant Shinder was in furtherance of the company overhaul that I had proposed to Defendant Bosov and was in the process of executing.

3. On or around March 21, 2020, Defendant Shinder requested that I create and send him an updated business plan. I proceeded to create the requested plan and sent it to Defendant Shinder. This adjusted restructuring plan was not the same restructuring plan that Defendant Shinder appeared to be implementing later that week. In particular, my adjusted restructuring plan did not recommend the complete layoff of all personnel and management, even temporarily.

4. Between March 24 and 26, 2020, I repeatedly attempted to contact Defendant Shinder by telephone, e-mail, and text message regarding company

matters, to which I received no response.  Attached as **Exhibit 61** is a true and correct copy of the text messages that I sent to him.  I no longer have access to my GFG email account and therefore cannot attach a copy of the email that I sent to him.  Defendant Shinder's persistent lack of response deeply troubled me, as I knew that the company was in dire financial straits and I was in the dark as to what business strategy the company had decided to pursue.

5.  On March 26, 2020, having received no response from Defendant Shinder for several days concerning company business, I decided to fly to Los Angeles from New York to confront Defendant Shinder in person.  At 12:36 p.m. Eastern Daylight Time, while I was still on the plane, I received from Defendant Shinder via text message the various March 23, 2020 Board directives and executive orders terminating all GFG personnel.  Attached as **Exhibit 62** is a true and correct copy of these text messages.  This was the first time that I had seen these directives and orders.  I immediately forwarded these to Michelle Lynd (CLO) and Datesh Kshatriya (CFO) via text message.  Attached as **Exhibit 63** is a true and correct copy of these text messages.  At no point prior to this did I receive these directives or orders from Defendant Shinder, Ms. Lynd, or anyone else.  This is confirmed in my March 31, 2020 e-mail to the GFG Board of Directors, attached as **Exhibit 53** to Defendant Shinder's second declaration, wherein I state that these directives were "released to the Genius Fund executive staff on 3/26/20."

6.  I did not have any telephone conversation with Defendant Shinder on March 26, 2020, at approximately 11:40 p.m., as stated in paragraph 14 of Defendant Shinder's second declaration.  At that time, I was not in New York; I was in Los Angeles and I had already participated in an in-person meeting with Defendant Shinder at GFG headquarters that very afternoon.[1]  Attached as **Exhibit**

---

[1] To the extent Defendant Shinder meant March 25 rather than March 26, no such conversation occurred on March 25 either.  I traveled to Los Angeles from

**64** is a true and correct copy of my flight itinerary for that trip, showing that my flight landed in Los Angeles at midday on March 26.

7. On March 26, 2020 (not March 27), I drove directly from LAX to GFG's headquarters in Culver City with Ryan Tongol, GFG's Head of Security. Upon ascending the stairs to the second floor, I greeted Ms. Lynd, who was at a conference table just past the top of the stairs and who was in a meeting with two other persons, and told her that I needed to speak with Defendant Shinder. Defendant Shinder came and met with Mr. Tongol and myself; however, Ms. Lynd remained in her other meeting and did not participate in the meeting with Defendant Shinder, Mr. Tongol, and myself.

8. During that meeting, Defendant Shinder explained that he had purposefully not responded to my communications that week because he was advised not to do so by the Honorable Eugene Sullivan, who was a GFG Board member and partner at the law firm of Freeh Sporkin & Sullivan, LLP, on the basis that such communication might expose Defendant Shinder or the company to liability given the Board's recent termination orders.  Regarding company operations, Defendant Shinder informed me that he was seeking additional investment from an outside investor, and that only if he secured that investment would I be allowed to continue to participate in some form with the company. Defendant Shinder informed me that, unless and until he had secured such an investment, all company operations would cease and all employees would be laid off in accordance with the March 23 termination directives.  Defendant Shinder

---

New York on March 26 precisely because I had received no communication from Defendant Shinder for days.  Nor had I even received the termination orders on March 25, and thus I would not have been specifically concerned about whether I was exempt from them.  Had Defendant Shinder actually continued to communicate with me during the week of March 23, I would not have felt it necessary to travel across the country to Los Angeles on March 26 to speak to him, which was only days after my baby was born and during the COVID-19 lockdown.

further stated that, even if he did secure such an investment, the GFG company structure as it then existed would likely be dissolved and operations would commence anew under a different company structure—which would involve a complete layoff and rehire of all personnel virtually overnight.² At the conclusion of our meeting, Defendant Shinder agreed to meet with me again the next day (March 27) at or around midday to further discuss the company's business plans going forward.

9. On March 27, 2020, at 12:27 p.m., after I had arrived at GFG headquarters, I texted Defendant Shinder inquiring as to his whereabouts. Defendant Shinder responded that he was in several meetings and thus led me to believe that he would not be returning to the office for our preplanned meeting. Attached as **Exhibit 65** is a true and correct copy of these text messages.³ At 2:37 p.m., I called Defendant Shinder and spoke to him for 29 minutes. Attached as **Exhibit 66** is a true and correct copy of my telephone bill showing this call. During this call, Defendant Shinder informed me that the potential investor had not committed any funds. Defendant Shinder again confirmed to me that, in accordance with the March 23 directives, GFG would need to cease operations and lay off all employees should an investor not come through; nonetheless, he instructed me not to begin the employee termination process at this time despite those Board directives.

10. When I was CEO, I was part of a weekly conference call with GFG leadership personnel. This call typically occurred on Thursdays; however, due to the lack of information from Defendant Shinder regarding the direction of the

---

² I also expressed concern to Defendant Shinder about the sheer logistics of terminating all employees and rehiring all employees under a different company structure.

³ I believe that the time stamps on these text messages reflect Eastern Daylight Time and not Pacific Daylight Time.

company, I had postponed that week's call from Thursday, March 26, to Friday, March 27 at 4:00 p.m.  After I finished my 2:37 p.m. telephone call with Defendant Shinder, I initiated the 4:00 p.m. weekly conference call.  During that telephone call, I explained that the company had been sold to Defendant Shinder and that although Defendant Shinder did not have a plan moving forward, he would be in touch with the employees as soon as possible to provide the path forward.  Attached as **Exhibit 66** is a true and correct copy of my telephone bill showing this call.  Mr. Shinder did not participate in this call.

11.   After March 27, I periodically continued to communicate with company employees and officers, which included accepting calendar invitations to participate in conference calls with Defendant Shinder on March 29 and 30 in order to learn whether or not Defendant Shinder had secured additional funding.  I also responded to certain e-mails that appeared to be questioning decisions I had previously made in my capacity as CEO in order to make a record of my perspective on the particular dispute.

12.   On Tuesday, March 31, I sent an e-mail to GFG's Board of Directors seeking information on the future operations of GFG and the status of GFG employees.  By this time, it was completely unclear to me what the current and future status of GFG's current operations were (or whether GFG would even have operations).  As I indicated in that e-mail, the only official Board directives I had received were the March 23 directives and orders shutting down the company and terminating all employees without exception by March 27.  I wrote that Defendant Shinder had nonetheless instructed that GFG employees were not to be laid off on March 27; yet, on March 29, Defendant Shinder had "directed a complete shutdown and layoff."  It appears that the remainder of this sentence was cut off.  I did not receive any response to this e-mail.

13.   Later on Tuesday, March 31, I sent an e-mail directly to Defendant Shinder again reiterating the confusion and lack of direction regarding current and

1564457.3                                             -5-                      Case No. 2:20-cv-03797-FMO (JCx)
SECOND SUPPLEMENTAL DECLARATION OF FRANCIS J. RACIOPPI, JR.

future GFG operations (if any) and the status of GFG employees. I again identified the March 23 Board directives terminating all employees, as well as Defendant Shinder's March 29 directive that "all GF employees were to be laid off immediately pending legal documentation to be drafted by Michelle [Lynd] and your outside legal team." I also made clear that I had not been paid my $300,000 signing bonus, nor had I been reimbursed $12,463 in relocation expenses promised to me under my employment contract, and that I needed to know whether or not I should continue the process of relocating my family from New York to Los Angeles. I therefore asked for "an immediate update as to your intentions of the company, its employees, my future status with the company, and your intent to honor the terms of my contract." I did not receive any response to this e-mail.

14. I spoke to Defendant Shinder several times during the week beginning March 29 regarding the status of additional investor funding. At certain points, Defendant Shinder indicated that additional funding was imminent; yet, each time, he would subsequently confirm that no such funding had been received. On April 1, 2020, at approximately 11:41 p.m., I spoke to Defendant Shinder by telephone for eight minutes, at which time he confirmed to me that he had not been able to secure any additional investor funding in GFG. Attached as **Exhibit 67** is a true and correct copy of my telephone bill showing this call.

15. At the time GFG first acquired the property at 0 Bolsa Road, Hollister, California (the "Bolsa Road Property"), I was working as GFG's Chief Operations Officer (and informally as GFG's co-CEO). I was involved with, and had knowledge of the circumstances surrounding, the purchase of this property. Although the sale of this property to GFG was ultimately finalized on April 3, 2020, the price was negotiated and agreed upon in January and February 2020 (prior to the COVID-19 crisis in the United States), and the closing date was the end of February 2020. The closing of the property was delayed due to the escrow agent being overwhelmed with other work.

16. I am aware that there are numerous structures on the Bolsa Road Property that are intended to support the commercial cultivation of cannabis. At the time of the purchase, almost none of those structures were properly licensed for that purpose, and had not been licensed by the time I separated from GFG. Based on my job duties while working as GFG's COO and CEO, and my understanding of the commercial cannabis licensing process in California, I am also aware that it will likely take more than two years for final approval of the necessary licenses from the relevant government authorities.

17. The GFG employee who supervised the December 2019 appraisal, Michael Andrews, was actively seeking employment with the seller of the property. I learned this from Ms. Lynd, who had apparently received an e-mail from Mr. Andrews that appeared to have been inadvertently sent to Ms. Lynd indicating that Mr. Andrews was seeking employment (or had already been hired) with the seller of the property.

18. My salary as COO of GFG was $350,000.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 20, 2020, at North Kingston, Rhode Island.

Francis J. Racioppi, Jr.