BROWNE GEORGE ROSS LLP
Thomas P. O'Brien (State Bar No. 166369)
  tobrien@bgrfirm.com
Jennie Wang VonCannon (State Bar No. 233392)
  jvoncannon@bgrfirm.com
David J. Carroll (State Bar No. 291665)
  dcarroll@bgrfirm.com
Nathan F. Brown (State Bar No. 317300)
  nbrown@bgrfirm.com
801 S. Figueroa Street, Suite 2000
Los Angeles, California 90017
Telephone: (213) 725-9800
Facsimile: (213) 725-9808

Attorneys for Plaintiff
Francis J. Racioppi, Jr.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCIS J. RACIOPPI, JR., <br><br> Plaintiff, <br><br> vs. <br><br> DMITRY BORISOVICH BOSOV *et al.*, <br><br> Defendants. | Case No. 2:20-cv-03797-FMO (JCx) <br><br> **PLAINTIFF'S REPLY IN SUPPORT OF *EX PARTE* APPLICATION TO CERTIFY FACTS CONSTITUTING CONTEMPT, TO SET AN ORDER TO SHOW CAUSE HEARING RE: CONTEMPT, AND FOR OTHER RELIEF** <br><br> Judge: Hon. Jacqueline Chooljian <br> Date: October 14, 2020 <br> Time: 3:30 p.m. <br> Crtrm.: 750 (Telephonic) <br><br> Trial Date: October 5, 2021 |

1677359.8

Case No. 2:20-cv-03797-FMO (JCx)

PLAINTIFF'S REPLY ISO *EX PARTE* APPLICATION TO CERTIFY FACTS CONSTITUTING CONTEMPT

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

On top of the relief that Mr. Racioppi requested in his original application, it is now apparent—based on the near-daily irreconcilable revelations of the circumstances surrounding the underlying transfers in response to the application—that an evidentiary hearing before this Court is required to get to the bottom of the Contemnors' violations of the Right to Attach Order.  Mr. Racioppi therefore requests that the Court order such a hearing and in the meantime freeze all assets subject to the Right to Attach Order—whether held by the Genius Fund entities, Heli Biotech, Mr. Ohayan, or yet another entity or person—including real estate and approximately $1.5 million dollars'-worth of tangible property such as hemp, heavy machinery, and vehicles.

### A. The Genius Fund Entities' Opposition

The Genius Fund entities'[1] opposition to Mr. Racioppi's contempt application does not justify withholding contempt sanctions against them.  In attempting to pin the blame on Defendant Shinder for the transfers of assets to Mr. Ohayon, the Genius

---

[1] The opposition was filed on behalf of Defendants Genius Delivery LLC, Genius Fund I, Inc., Genius Fund I, LLC, Genius Products LLC, Genius Products NT, Inc., Genius Products T, Inc., Genius Products, Inc., Genius Sales LLC (collectively, "the Genius Fund entities")—eight defendants that were previously represented by attorneys David Golubchik and Kurt Ramlo.  The law office of Larson O'Brien LLP substituted in as counsel for Mr. Golubchik and Mr. Ramlo for those entities.  ECF Nos. 96, 98, 99, 103, 104.  The following ten remaining defendants that have appeared in this case continue to be represented by Mr. Golubchik and Mr. Ramlo: Gary I. Shinder, Aristotle Equipment LLC, Dr. Kush World Collective LLC, ESSMW - Earth Solar System Milky Way LLC, Eagle Rock Herbal Collective LLC, Full Circle Labs LLC, Heli Biotech LLC, Nature's Holiday LLC, Planck Properties LLC, Variant Hemp Solutions LLC.  Only two of these ten defendants, Defendant Shinder and Defendant ESSMW - Earth Solar System Milky Way LLC, have responded to Mr. Racioppi's application in a response filed by Mr. Golubchik on October 13, 2020.  ECF No. 106.  All eighteen of the defendants that have appeared in this action are referred to collectively as the "Genius Fund Group."

Fund entities miss the point. While the July 21, 2020 settlement agreement apparently effectuated the transfer of real property (including the Adelanto Property and apparently the Melrose Property, ECF No. 90-9) to Mr. Ohayan, the Genius Fund entities also effectuated their own separate transfer of assets subject to the Right to Attach Order in September 2020 in a purported assignment for the benefit of creditors. Thus, the Genius Fund entities are *currently* out of compliance with the Right to Attach Order because they also secretly transferred assets, yet still have not created the necessary escrow accounts, and they refuse to bring themselves into compliance—to the extreme detriment of Mr. Racioppi, whom the Order was designed to protect.[2] That alone justifies civil contempt sanctions. In any event, based on Heli Holdings and Mr. Ohayon's (collectively, "Mr. Ohayon's") opposition filed today, ECF No. 102, it appears that Defendant Shinder did have authority to transfer the assets at issue in the July 2020 settlement agreement—or at least it reasonably appeared to Mr. Ohayon that he did. The result cannot be that the Genius Fund entities can indefinitely remain indisputably out of compliance with the Right to Attach Order without any coercive sanction.

Moreover, the Genius Fund entities' portrayal of themselves as equally innocent victims of Defendant Shinder's alleged fraud appears to be untrue. Both Mr. Ohayon's opposition and Defendant Shinder and ESSMW – Earth Solar System Milky Way, LLC's (collectively, "Defendant Shinder's") response, ECF No. 106,[3] appear to directly contradict, with documentary evidence, the assertions that the

---

[2] Although the Genius Fund entities dispute that they intentionally violated the Right to Attach Order, they do not dispute either that they are currently out of compliance with the Right to Attach Order by not having funded the escrow accounts, or that immediate funding of the escrow accounts is at least among the appropriate remedies to bring the Contemnors back into compliance.

[3] *See* Declaration of David B. Golubchik in support of Defendant Shinder's response ("Golubhik Decl.") ¶ 6, Ex. A at 2.

Genius Fund entities make about the underlying transactions between them and Mr. Ohayon.  And the Genius Fund entities' opposition itself contained numerous omissions about what they knew about those transactions, when they knew it, and whether, to what extent, and for how long they withheld this information from Mr. Racioppi's counsel (which alone violated the Right to Attach Order).  The transfers of assets to Mr. Ohayon are also not the Genius Fund entities' only failure to comply with the Right to Attach Order: they have repeatedly failed to timely and fully comply with the balance sheet requirements in the Right to Attach Order; they provided Mr. Racioppi with a balance sheet that contains what appears to be a fraudulent valuation of their assets; they have recently attempted to assign *all* of their assets to a third party assignee for liquidation in violation of the Right to Attach Order; and they failed to provide Mr. Racioppi with any notice of that assignment, as required by the Right to Attach Order.

      Nor can the Genius Fund entities use a Right to Attach Order entered for Mr. Racioppi's protection to unwind the transactions with Mr. Ohayon for their *own* purposes.  The Genius Fund entities have made abundantly clear that, despite their earlier representations to this Court at the May 12, 2020 hearing on Mr. Racioppi's application for a writ of attachment that they needed to maintain control of their assets in order to operate the cannabis business "in the ordinary course of business," they actually intend to liquidate all of their assets in an attempt to get out from under the Right to Attach Order.  Accordingly, the Genius Fund entities cannot be trusted with these assets any more than Mr. Ohayon.  For these reasons, an immediate asset freeze is necessary as well.

      At bottom, Mr. Racioppi is the only party who actually has clean hands here, and the Court can and should immediately put Mr. Racioppi back into the position that the Right to Attach Order was intended to preserve—*i.e.*, with assets outside the grasp of the Genius Fund entities or Heli Holdings or Mr. Ohayon to secure Mr. Racioppi's employment claims against the Genius Fund Group—and allow the

Contemnors to sort out their separate transactional dispute in the appropriate forum. For these reasons, Mr. Racioppi requests that the Court grant his *ex parte* application in full and issue an immediate asset freeze.

### B. Mr. Ohayon's Opposition

The facts revealed in Mr. Ohayon's opposition, supported by documentary evidence, fly directly in the face of the Genius Fund entities' claim that they did not know about the transfer(s) of the Adelanto and Melrose Properties effectuated by the July 2020 settlement agreement until "the week of September 28," that Defendant Shinder was not authorized by the company to enter into the agreement with Mr. Ohayon, and that Mr. Ohayon could not have reasonably believed that Defendant Shinder was authorized to execute that agreement. *See* ECF No. 102. In reality, it appears that: the Genius Fund entities knew full well about their negotiations with Mr. Ohayon; the Genius Fund entities *directed* Mr. Ohayon to negotiate a resolution with Defendant Shinder; and the Genius Fund entities' counsel intended to review the very settlement agreement at issue.

However, Mr. Ohayon's argument that he reasonably believed himself to be in compliance with the Right to Attach Order rings hollow. Even assuming that he believed that the Genius Fund entities would take care of dissolving the Right to Attach Order, Mr. Ohayon does not point to any time subsequent to the execution of the July 2020 settlement agreement when he was informed, or could have reasonably believed, that the assets that were transferred to him were no longer subject to the Right to Attach Order. Yet, for example, he recorded the grant deed transferring the Adelanto Property on September 18, 2020—and he provided no notice to Mr. Racioppi nor did he create an escrow account. That in and of itself is a knowing violation of the Right to Attach Order.

## II. ARGUMENT

### A. Mr. Racioppi Seeks Relief Against at Least Six Genius Fund Entities

The Genius Fund entities' opposition to Mr. Racioppi's *ex parte* application

was ostensibly filed on behalf of one of the specifically-identified Genius Fund contemnors (Defendant Genius Fund I, Inc.), plus several other Genius Fund entities that Mr. Racioppi's application did not specifically identify by name. *See* App. at 2 n.3, ECF No. 90. In their opposition, the Genius Fund entities oppose contempt sanctions against Defendant Genius Fund I, Inc., and assert that this entity is the "only" Genius Fund entity identified as a contemnor in Mr. Racioppi's application. Genius Opp'n at 1 n.2, ECF No. 100. This is not correct for two reasons. First, Mr. Racioppi expressly seeks relief against Defendant Genius Fund I, Inc. and five additional Genius Fund entity defendants (Defendant Planck Properties LLC, Defendant Goldhawk Investments Ltd., Defendant Dr. Kush World Collective LLC, Defendant Eagle Rock Herbal Collective LLC, Defendant Aristotle Equipment LLC), as well as Defendant Shinder, Heli Holdings LLC, and Mr. Ohayon. App. at 2 n.3. These six Genius Fund entities were all named parties to the July 21, 2020 asset transfer to Heli Holdings. O'Brien Decl. ¶ 4, Ex. H.

Second, Mr. Racioppi also expressly seeks relief against these parties' "co-conspirators." App. at 2 n.3. As Mr. Racioppi extensively briefed in connection with his original application for a prejudgment writ of attachment, ECF No. 10, the myriad entities comprising the Genius Fund Group are simply alter egos of each other and not truly separate corporate entities. Thus, to the extent any unnamed Genius Fund defendants were controlled by or acting in concert with the named Genius Fund contemnors—such as Defendant Genius Fund I, LLC, which apparently is Defendant Genius Fund I, Inc.'s parent entity, Genius Opp'n at 1 n.1—those parties are equally part of and subject to this application for contempt sanctions.

### B. The Appropriate Remedy Is to Order the Contemnors, Including Genius Fund, to Fund the Escrow Accounts Required by the Right to Attach Order

The Right to Attach Order prohibited the transfer of any assets unless prior notice was provided to Mr. Racioppi's counsel and the first $3.7 million of such transfer was placed into an escrow account. Here, the Contemnors transferred

millions of dollars of assets in multiple transactions, yet none of them gave prior notice to Mr. Racioppi of a single one of those transactions, nor did they create or fund any such escrow accounts. Thus, to bring those parties into compliance with the Right to Attach Order, the Court should order the Contemnors to fund the escrow accounts—one for each of the Genius Fund entities that transferred assets in violation of the Right to Attach Order.

The Genius Fund entities do not argue that the creation and funding of an escrow account is an inappropriate remedy for the contempt of the Right to Attach Order. Instead, the Genius Fund entities argue that they should not be held in contempt because, essentially, they were unaware of that their CEO had violated the Right to Attach Order on their behalf. For two reasons, this does not absolve them of civil contempt sanctions. First, it is apparent now that the Genius Fund entities *did* know that Defendant Shinder was entering into the July 2020 agreement on the Genius Fund entities' behalf. Ohayan Decl. ¶ 2, Ex. 1, ECF No. 102-2. Second, in any event, they overlook the fact that the Genius Fund entities are *now* (and continue to be) knowingly and willfully out of compliance with the Right to Attach Order. Civil contempt is remedial and forward-looking; rather than punishing the contemnor for the mere violation of the order (which is the function of criminal contempt); civil contempt simply seeks to force an out-of-compliance contemnor back into compliance with the order. *See, e.g.*, *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 517 (9th Cir. 1992). Here, the Genius Fund entities are undisputedly out of compliance with the Right to Attach Order because they transferred assets to a third party on multiple occasions—under the direction of both Defendant Shinder and Jason Senior, Defendant's Shinder's replacement as CEO—without prior notice to Mr. Racioppi and without creating an escrow account each time. They can bring themselves back into compliance with the order by funding the necessary escrow accounts as Mr. Racioppi has asked them to do, but they have not done so. Consequently, coercive contempt sanctions are necessary and appropriate to compel

such compliance.

### C. The Genius Fund Entities Are Far From Innocent Victims

Although the Genius Fund entities portray themselves as innocent victims of Defendant Shinder's conduct, it is now apparent that this is simply not true. First, as stated above, Mr. Ohayon's opposition demonstrates the Genius Fund entities' knowledge of Defendant Shinder's negotiations and settlement agreement with Mr. Ohayon. And, in any event, there are numerous unanswered questions about their handling of the assets subject to the Right to Attach Order in general. Those questions heavily suggest both that the Genius Fund entities are not being as forthcoming as they now hold themselves out to be, and that they have taken actions in bad faith as part of tactical maneuvering to undercut or eliminate the assets securing Mr. Racioppi's claims.[4]

First, on top of the facts raised in Mr. Ohayon's opposition, the Genius Fund entities' *own* description of the events leading to Mr. Racioppi's notification of the underlying transactions only raises more questions than it answers. Those issues include:

- The Genius Fund entities asserted that Defendant Shinder was terminated on August 18, 2020—about one month after the disputed transactions pursuant to the settlement agreement with Mr. Ohayon occurred. Yet they provided no explanation for why he was terminated, nor did they deny that it was unrelated to the underlying transactions—thus raising the question of when the entities knew of those transactions.

- It is unclear why, after Defendant Shinder was terminated, the Genius Fund entities needed to hire a private investigator to conduct a multi-week surveillance in September 2020 on what they supposedly believed to be their own properties—and purportedly to determine if the already-terminated Defendant Shinder was (still?) stealing from the company. The Genius Fund Board of Directors could have easily (and openly) demanded a full and independent accounting of their own assets, and thus it is unclear why there was any need for secrecy at all in their investigation. In addition, the transfer of these tangible assets (which were preserved to protect Mr. Racioppi's claim) was not reported to either Mr. Racioppi or the Court until October 2020.

---

[4] This was precisely the type of behavior that Mr. Racioppi was seeking to prevent in seeking the Right to Attach Order in the first place. *See* ECF No. 10.

- It is unclear how the Genius Fund entities did not learn until "the week of September 28" that virtually *all* of their assets—both real property and movable assets—had been sold and transferred to Mr. Ohayon, despite: the first of several real estate transfers occurring on July 21, the Genius Fund entities hiring a private investigator before September 10, and the Genius Fund's attorney Mr. Golubchik directing Mr. Ohayon to negotiate a settlement with Defendant Shinder in July.

- The Genius Fund entities' equivocation about when they learned about the underlying transfers—"the week of September 28"—heavily suggests that they intentionally withheld this information from Mr. Racioppi's counsel for a period of time before October 2. Indeed, the Genius Fund entities informed Mr. Racioppi about these transfers on October 2 only after *Mr. Racioppi* reached out to them after learning from other sources about a *different* set of asset transfers that they attempted to undertake (the assignment for the benefit of creditors). Again, this is all despite an unequivocal court order requiring that the Genius Fund entities give notice to Mr. Racioppi prior to *any* transfer of assets.

Moreover, and perhaps more critically, the Genius Fund Group has stepped out of compliance with the Right to Attach Order on several other occasions, as identified below. This has significantly eroded any trust that Mr. Racioppi has in the Genius Fund entities' future compliance with the Right to Attach Order; at this point, it is clear that they intend to liquidate or transfer all of their current assets and any additional assets that come into their possession, which will leave Mr. Racioppi with an empty judgment. These failures to comply include:

- **<u>Untimely Balance Sheets.</u>** The Genius Fund Group repeatedly failed to provide timely balance sheets to Mr. Racioppi as required under the Right to Attach Order, and for the month of July 2020—the month in which the transfers at issue occurred—completely failed to provide Mr. Racioppi with *any* balance sheet.

- 



- **Assignment of Assets.**  As indicated above, on September 25, 2020, the Genius Fund entities transferred all of their assets to another entity—Genius Fund I ABC, LLC—in an attempted assignment for the benefit of creditors.  Once again, they failed to provide any notice to Mr. Racioppi of yet another transfer of assets in violation of the Right to Attach Order; instead, Mr. Racioppi had to learn about this transfer of assets from another Genius Fund creditor.  Moreover, as explained in the following section, Mr. Racioppi's claim to the attached assets cannot be extinguished through an assignment for the benefit of creditors.

- It is unclear why the Genius Fund entities so fervently seek to claw back their assets from Mr. Ohayon when it is their apparent intention to then put those assets into a bankruptcy-type proceeding anyway.  This further suggests that the assignment for the benefit of creditors that they are seeking to undertake is simply an attempt to defraud one or more of its creditors, or to impermissibly favor one creditor over another—all to the detriment of Mr. Racioppi.

D. **The Court Should Not Summarily Transfer Ownership of the Assets Back to the Genius Fund Entities**

The Genius Fund entities ask for a drastic remedy that even Mr. Racioppi did not request and which would seriously prejudice him: to summarily determine the merits of an alleged fraudulent conveyance action against Mr. Ohayon, and then claw back the transferred assets from Mr. Ohayon.  Such a remedy, they believe, should be ordered on an *ex parte* basis and based on the declaration of the Genius Fund entities' current CEO—who seems to lack any personal knowledge of the disputed transaction and is the person who was CEO when Mr. Racioppi was provided at least one of the

potentially fraudulent balance sheets described above.  Nor is it clear how the Genius Fund entities even have standing to exploit the Right to Attach Order for their own ends in a manner that is unrelated to this action—*i.e.*, to summarily unwind a transaction with Mr. Ohayon to which they no longer wish to be bound, so that they can then liquidate the assets rather than preserve them as security for Mr. Racioppi's claim as this Court previously ordered.

Moreover, now that it has come to light through Mr. Ohayan's opposition that the Genius Fund entities' counsel *instructed* Mr. Ohayon to negotiate a deal with Defendant Shinder, there is virtually no chance of them prevailing on an action for fraudulent transfer.  *C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.*, 213 F.3d 474, 479 (9th Cir. 2000) ("An agent acting within his apparent or ostensible authority binds the principal where the principal has intentionally or negligently allowed others to believe the agent has authority.").

### E. This Court Should Immediately Freeze the Transfer of All Assets

The cavalier attitude that the Contemnors have displayed towards this Court's Right to Attach Order is astonishing, and it becomes clearer by the day that none of them can be trusted to comply with this Court's order while holding title to these assets.  The Court should thus immediately freeze the transfer of any and all property—both real and tangible—subject to the Right to Attach Order until a full evidentiary hearing can be conducted on the myriad violations of the Right to Attach Order that are coming to light on a near-daily basis.

The most immediate and urgent concern is the Genius Fund entities' stated intentions to liquidate all of their assets under the guise of a purported assignment for the benefit of creditors.  *See* Cal. Code Civ. Proc. §§ 493.010 *et seq.*  This includes the assets of ten Genius Fund entities that are expressly subject to the Right to Attach Order, and which Mr. Racioppi understands to hold a substantial portion of all of the Genius Fund Group's assets.  It is therefore near certain that, should the Genius Fund entities reacquire title to the assets they transferred to Mr. Ohayon, they will once

again attempt to liquidate those assets through the assignment process.

The Right to Attach Order bars that process. Although a lien created by a writ of attachment can be extinguished through a proper and timely assignment for the benefit of creditors, *see* Cal. Code Civ. Proc. § 493.030(a), that provision does not affect Mr. Racioppi's Right to Attach Order in this action for three reasons. First, neither of the two Genius Fund parent companies (Genius Fund I, Inc. and Genius Fund I, LLC), both of which are subject to the Right to Attach Order, have undertaken an assignment for the benefit of creditors. Because all Genius Fund assets are effectively controlled by the Genius Fund parent companies, the assignment of the company's assets violates the Right to Attach Order irrespective of the fact that the subsidiary companies themselves have purported to undergo the assignment process.

Second, and in any event, the Right to Attach Order here is broader than a mere writ of attachment, and those additional orders contained within the Right to Attach Order cannot be extinguished by assignment. The Right to Attach Order in this action was the product of a negotiated compromise to allow the Genius Fund Group to continue conducting normal business operations during the pendency of the case, which it represented to this Court to be its intention.[5] As part of that compromise, Mr. Racioppi agreed that the Genius Fund Group could use its assets to conduct normal business operations as long as its balance sheets were not materially impaired. Mr. Racioppi even further agreed that the Genius Fund Group could transfer or sell assets outside of the normal course of business as long as they notified Mr. Racioppi of such and set aside funds in an escrow account from that sale. In other words, in exchange for Mr. Racioppi agreeing not to lock down the Genius Fund Group's assets to the full

---

[5] As the Court knows, at the May 21, 2020 hearing on Mr. Racioppi's application for a writ of attachment, counsel for the Genius Fund Group specifically requested a "carve-out" in the attachment order to allow them to make transfers in the "ordinary course of business" for the purposes of "keeping the doors open" and operating the business.

extent he would otherwise have been entitled to do under law (which would have included having the U.S. Marshals Service ("USMS") seize virtually all of its tangible assets),[6] the Genius Fund Group provided Mr. Racioppi with certain stipulated guarantees to ensure that his claim would remain secured throughout the duration of his case. That agreement, in turn, became an order of this Court—and is larger in scope than a mere directive for the Clerk to issue a writ of attachment on certain physical property that may be extinguished by an assignment. Despite this Order, and despite the negotiated compromise that led to the Order, the Genius Fund entities are now seeking to liquidate their assets and leave Mr. Racioppi with no security whatsoever for his claims. The Genius Fund entities cannot do that.

Third, with respect to the real property assets specifically, Mr. Racioppi has thus far been unable to levy on those assets for reasons wholly beyond his control. As Mr. Racioppi previously informed this Court, *see* ECF No. 64 at ¶ 5, due to the COVID-19 pandemic, neither the USMS nor the Los Angeles County Recorder's Office would process real property levies for prejudgment writs of attachment. This is because such writs must be recorded in person, and neither the USMS nor the Recorder's Office was accepting in person appointments. Thus, as a matter of equity, this Court should deem the writs to have been levied on the real properties on the date that it issued the Right to Attach Order—*i.e.*, May 28, 2020. And because that date is more than 90 days before the Genius Fund entities purported to undertake an assignment for the benefit of creditors, that assignment does not extinguish Mr. Racioppi's writs of attachment. *See* Cal. Code Civ. Proc. § 493.030(a) (writ is extinguished only where assignment occurs within 90 days).

### III. CONCLUSION

For the foregoing reasons, Mr. Racioppi respectfully requests that the Court

---

[6] Given the issues raised in Mr. Racioppi's application and the oppositions of the Genius Fund entities, Mr. Ohayon, and Defendant Shinder, it appears that such seizure is now appropriate and necessary to protect Mr. Racioppi's interests.

grant his *ex parte* application in full. In addition, Mr. Racioppi requests that this Court order an evidentiary hearing to be conducted within the next three weeks, and prohibit any further transfer of any assets contemplated by the Right to Attach Order by ordering the immediate seizure of all of these assets by the USMS.

DATED:  October 13, 2020

Respectfully submitted,

BROWNE GEORGE ROSS LLP
    Thomas P. O'Brien
    Jennie Wang VonCannon
    David J. Carroll
    Nathan F. Brown

By:  /s/ Thomas P. O'Brien
      Thomas P. O'Brien
Attorneys for Plaintiff Francis J. Racioppi, Jr.